Richard STACK, Petitioner,

v.

Paul K. VESTAL, Jr., and the Attorney General of the State of Maine, Respondents.

Civ. No. 82–0078–B.

United States District Court, D. Maine.

June 17, 1982.

Richard Stack, pro se.

Wayne S. Moss, Asst. Atty. Gen., Crim./Appellate Section, Augusta, Me., for respondents.

## MEMORANDUM AND ORDER DISMISSING PETITION

CYR, District Judge.

Richard Stack, who is presently incarcerated in Maine State Prison on a felony conviction for arson, petitions the Court for a writ of habeas corpus on the grounds that he was unconstitutionally denied the right

order which assessed fees and costs against the    Lincoln County defendant.

to cross-examine a key prosecution witness during his trial in Cumberland County Superior Court.[1]

Robert Munroe testified that at about 6:10 p. m. on November 16, 1979, the night of the fire, he went to the home of his neighbors, the Fothergills, to use their telephone. When Munroe arrived at the Fothergill house, he found the door propped shut from the inside by a chair. [Tr. at 115.] After being let into the house, Munroe encountered Richard Stack, Frederick Fothergill (convicted of arson along with the petitioner) and Joe Dube. After Munroe completed his telephone call, Stack asked him outside to talk, where Stack told him that he (Munroe) "had screwed up everything by returning home [to North Windham and] that he [Stack] was going to torch the place [Fothergill house] up [that night] for insurance money, which was $80,000." [Tr. at 120.] Munroe asked Stack "about the neighbors and he [Stack] said that he knew where they were and they wouldn't be coming home for a while." [Tr. at 122.] Munroe left the Fothergill house and returned home. At about 8:30 p. m., Munroe saw heavy smoke coming from the Fothergill house. At about 9:00 p. m., he saw flames starting to break out. According to Munroe, at about 9:30 p. m. Stack came to him and said that if either of two Windham police officers asked him questions he was to make sure he got his story straight. [Tr. at 124.] Three days later, according to Munroe's testimony, Stack came by Munroe's house to "make sure you got your story straight" and suggested a story Munroe was to tell the police if they asked any questions about the evening of the fire. [Tr. at 126–27.]

On direct examination at trial Munroe admitted that on the night of the fire he made a false statement to a Windham police officer with regard to where he had been that night and what he knew about the origin of the fire.[2] [Tr. at 127.]

On cross-examination Munroe testified that on the morning after the fire he had lied to his mother about what had happened the previous night, telling her that he had gone next door to get a ride to North Windham to use the telephone and that Stack had offered to give him a ride. [Tr. at 161–62.] Munroe further testified on cross-examination that he gave a written statement to a Windham police officer on November 20, 1979, in which he stated that on the night of the fire he had gone to the Fothergill house, called his girlfriend, walked to the bridge, then to a store and home.[3] [Tr. at 164.]

On November 28, 1979 Munroe was asked to come to the Windham Police Station to talk with a state police officer, a local police officer, and the Windham fire chief. After being interrogated for more than an hour [Tr. at 132], during which, according to Munroe, he attempted, but failed, to make up "one big story" which would "sound right," Munroe gave a written statement which accords in substance with his trial testimony. [Tr. at 129–30.]

On cross-examination, defense counsel attempted to impeach Munroe with his prior inconsistent statements concerning the events of the night of the fire and to show that the written statement made by Munroe on November 28, 1979, repeated in substance at trial, was elicited by police threats of criminal prosecution and punishment for arson. Under this cross-examination, Munroe testified that during the interview by the police on November 28, 1979 he was accused of involvement in the fire and that he was told by the officers that "if you [don't] have anything to do with it, you want to be level because you're only 17 years old." Munroe was then asked by defense counsel whether he remembered

---

1. *But see State v. Stack*, Me., 441 A.2d 673 (1982).

2. Munroe told the officer that he had walked down to the corner and that on his way back he had seen the first fire engine heading toward the fire. [Tr. at 127, 160.]

3. On direct examination Munroe had testified, apparently in regard to the statement he gave the Windham police officer on November 20, 1979, that he told the officer that Stack had given him a ride to and from a North Windham payphone on the night of the fire. [Tr. at 128.]

the officers saying that: "The only way we're going to get to the bottom of this, Bob, this is a very serious crime, it's a Class A felon (sic). It's punishable by twenty years." [Tr. at 171.] The trial justice sustained an objection to this question on the grounds that the jury should not hear evidence which would permit them to be influenced by the punishment the *defendant* could receive upon conviction. The trial justice immediately instructed the jury that they should not consider matters relating to punishment. Because the defendant was on trial for the same offense as that with respect to which Munroe had supposedly been threatened by the police, the trial justice considered it prejudicial to permit questioning by defense counsel as to the maximum sentence for the crime as to which the police allegedly threatened Munroe. At sidebar the trial justice accordingly limited the scope of cross-examination by instructing defense counsel—". . . you can inquire as to what threat they made or whatever else, but you cannot obviously, bring the nature of the crimes, the severeness of the potential punishment before the jury." [Tr. at 173.]

## DISCUSSION

The Sixth Amendment to the United States Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. Const.Amend. VI. The right of confrontation is embodied primarily in the right to cross-examine and impeach adverse witnesses. *See Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974). Because bias is a relevant consideration in determining the weight to be given the testimony of any witness, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17, 94 S.Ct. at 1110 (citations and footnotes omitted). "Although the trial justice retains the traditional discretion to limit the scope of cross-examination, discretion in the area of bias evidence becomes operative only after the

constitutionally required threshold level of inquiry has been afforded the defendant." *United States v. Tracey*, 675 F.2d 433, 437 (1st Cir. 1982) (citations omitted). "Moreover, the judge's discretionary limitation of cross-examination must be done 'with the utmost caution and solicitude for the defendant's Sixth Amendment rights.'" *Id.* at 437, *quoting United States v. Houghton*, 554 F.2d 1219, 1225 (1st Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977). "[W]here the witness . . . may have some . . . substantial reason to cooperate with the government, the defendant should be permitted wide latitude in the search for the witness' bias." *United States v. Tracey*, *supra* at 438, citing *Burr v. Sullivan*, 618 F.2d 583, 586–87 (9th Cir. 1980); *United States v. Onori*, 535 F.2d 938, 945 (5th Cir. 1976).

The Court of Appeals for the First Circuit has recently approved the following standard for determining the propriety of a limitation on cross-examination:

The test for abuse of discretion . . . where the trial judge limited cross-examination on bias is whether the jury had sufficient other information before it, without the excluded evidence, to make a discriminating appraisal of the possible biases and motivations of the witness.

*United States v. Tracey*, *supra* at 437. If so, "[t]he court need not permit unending excursions into each and every matter touching upon veracity." *United States v. Fortes*, 619 F.2d 108, 118 (1st Cir. 1980).

The United States Supreme Court has held that the refusal by the trial court to permit any inquiry into the status of a key prosecution witness as a probationer for the purpose of demonstrating potential bias in favor of the state violates the constitutional right of confrontation. *Davis v. Alaska*, 415 U.S. at 320, 94 S.Ct. at 1112. The Court emphasized that defense counsel had not been permitted "to make a record from which to argue *why* the prosecution witness might have been biased or otherwise lacked the degree of impartiality expected of a witness at trial." *Id.* at 318, 94 S.Ct. at 1111. The Court further explained:

On the basis of the limited cross-examination that was permitted, the jury might

well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness. . . .

*Id.*

■ *Davis v. Alaska* involved an almost total prohibition against inquiry into witness bias or ulterior motive. In the present case the defendant was afforded ample opportunity to cross-examine on any ulterior motive Munroe may have had for cooperating with the State. Munroe testified to his dislike for the defendant Stack [Tr. at 152] and to numerous fights with the co-defendant Fothergill. [Tr. at 136.] The jury was made aware that Munroe was a suspect [Tr. at 171], that he had been interrogated for more than an hour on November 28, 1979, that there had been implicit assurances of assistance in getting Munroe into the military if he cooperated with the police [Tr. at 170], and that the police had implicitly threatened Munroe by warning him "to be level because [he was] only 17 years old" [Tr. at 171]. The jury was fully informed that Munroe had made numerous inconsistent statements prior to the November 28 interrogation by police and that only after that lengthy interrogation, at which various threats and inducements were made, did he implicate the defendant Stack. There can be no doubt that the jury had before it, without the excluded evidence, altogether sufficient information upon which to base a discriminating appraisal of any ulterior motivation that may have activated Munroe to testify as he did.[4] *See United States v. Tracey, supra* at 437.

Furthermore, it is significant that the trial justice did not forbid all further cross-examination even along this line. The trial justice expressly authorized defense counsel to pursue further inquiry "as to what threat they [the police] made . . ." [Tr. at 173], as well as inquiry into their threats to bring Munroe before the grand jury [Tr. at 173].[5] These authorized avenues of further inquiry were not pursued by the defendant, *see* Tr. at 357; Transcript of hearing on motion for new trial, at 49, notwithstanding the fact that such further inquiry would have fully informed the trial jury as to the

---

4. At the conclusion of the state court hearing on motion for a new trial, based on an affidavit executed by Munroe after trial in which he recanted his trial testimony, the trial justice observed: "I think counsel for the defense . . . did a rather excellent job attacking Mr. Munroe's credibility at trial but my concern is I think it's highly likely that the jury may well have discounted his testimony entirely." Transcript of hearing on motion for new trial, at 51, 54–55.

Munroe repudiated his post-trial affidavit at the hearing on the motion for a new trial, claiming that he had only signed the affidavit in the belief that it would help Stack get out on bail. *See id.* at 12–14, 24, 33, 43.

On the basis of an examination of the record of the state court proceedings, this Court cannot but share the impression of the trial justice. As a consequence, it seems highly problematic whether Munroe may even be considered a "key" witness in terms of the impact of his testimony upon the jury. *See United States v. Tracey, supra* at 437.

5. The transcript reflects that defense counsel asked the trial justice whether he could "mention that they threatened him [Munroe] in front of the Grand Jury?" But it seems clear that the intended thrust of this request was to determine whether he could inquire as to police threats to bring Munroe before the Grand Jury.

The transcript of the November 28, 1979 police interrogation of Munroe includes the following:

Q. We've got enough now, BOB, to go to the District Attorney. When we turn around and show him who was in on this thing and probably turn around and get a Grand Jury Indictment. And you'd be one of them that would probably be in that Grand Jury Indictment. Because you're the last people in that house. Then you won't be standing up on the stand and saying I won't take a polygraph, OK, because . . . break down the lying. You either tell the truth of (sic) you lie. And we've already got enough now to substantiate lies, OK.

Q. If you lie in court that's perjury, and they don't play games. And that's all a little separated (sic) sentence just to start with every time. There goes the Service for sure, there goes freedom. So let's get it up front now, BOB. The whole story right up front.

*See* State Exhibits 13 & 14, at 24 of November 28, 1979 interview transcript. Later in the trial, in referring to his earlier ruling striking the question posed by defense counsel, the trial justice stated: "[Defense counsel] did not press comments about going before the Grand Jury." *See* Tr. at 357. The transcript reveals no other references to threats made to Munroe about being brought before the Grand Jury.

very same ulterior motivation (avoidance of prosecution and punishment) that defense counsel had sought to expose by putting the earlier question to which objection was sustained.

Although the writ of habeas corpus "is a bulwark against convictions that violate 'fundamental fairness,'" *Engle v. Isaac*, —— U.S. ——, —— – ——, 102 S.Ct. 1558, 1570–71, 71 L.Ed.2d 783 (1982), it entails significant societal costs, by reason of its potential for frustrating the interests of the public and of the defendant in bringing about finality in criminal proceedings and for intruding upon the legitimate prerogatives of the States in the enforcement of their own criminal laws. *Id.* at 1571. Although trial court error resulting in fundamental unfairness must and will be corrected on habeas review, harmless error does not warrant habeas relief. *Allen v. Snow*, 635 F.2d 12, 15 (1st Cir. 1980), *cert. denied*, 451 U.S. 910, 101 S.Ct. 1981, 68 L.Ed.2d 299 (1981).

The Court concludes that no constitutional right of the defendant has been violated and that the petition must be DISMISSED.

SO ORDERED.