**UNITED STATES of America**

v.

**James W. BARRETT**

**Crim. No. 77–15 SD.**

United States District Court, D. Maine.

June 26, 1984.

Richard S. Cohen, F. Mark Terison, Portland, Me., for plaintiff.

John G.S. Flym, Northeastern University School of Law, Boston, Mass., Fred C. Scribner III, Falmouth, Me., for defendant.

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL

GENE CARTER, District Judge.

Defendant was tried for the offense of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d) and 18 U.S.C. § 2. The trial occupied the period March 26, 1984, to April 7, 1984. A verdict of guilty was returned on April 7, 1984. Pending before the Court are the Defendant's Renewed Motion for Judgment of Acquittal, filed on April 7, 1984, during the course of the jury's deliberations. After the return of the jury verdict, the Court indicated on the record that this motion would be treated by the Court as filed "within 7 days after the jury is discharged" as required by Fed.R.Crim.P. 29(c). Also pending is Defendant's Motion for Acquittal or New Trial, filed on April 18, 1984. Both motions raise numerous claims of error, some of which are common to the two motions. Oral argument of counsel was heard on the pending motions on May 11, 1984. The Court has received voluminous written briefing of the parties on the claims raised by the Defendant in these motions; in the case of the Defendant, such materials have been submitted both before and after the oral arguments on the motions. The Court will discuss and resolve herein the principal claims of the Defendant. All other claims

are denied on the record without discussion.

## I. *Claim of Failure to Charge the Defense's Theory of the Case.*

The Defendant requested an instruction be given to the jury "that the jury must acquit if they are unable to conclude beyond a reasonable doubt whether 3 or 4 persons participated in the robbery."[1] Motion for Acquittal or New Trial at 16.

Defendant now objects to the failure of the Court to instruct in the manner requested. The short answer to this claim of error is that the claim has not been preserved for its assertion as error. Fed.R. Crim.P. 30 provides specifically "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Precisely the same language appears in Fed.R.Civ.P. 51. The clear import of the language is that counsel must object to any claimed error in the charge before the jury retires to consider its verdict. The claim of error now asserted was not the subject of such timely objection at trial.

■ The First Circuit Court of Appeals has recently applied this language as it appears in Rule 51 of the Rules of Civil Procedure, and has held that it requires the objecting party to state any objection to instructions after the charge is given, not before. *McGrath v. Spirito*, 733 F.2d 967 (1st Cir.1984); *Carrillo v. Sameit Westbulk*, 514 F.2d 1214, 1219 (1st Cir.), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 445, 46 L.Ed.2d 385 (1975). The reason for the rule is to require counsel to give the trial judge an opportunity to correct any errors in the instructions given to the jury before it is too late to do so. *McGrath v. Spirito; Gay v. P.K. Lindsay Co., Inc.*, 666 F.2d 710, 712 (1st Cir.1981), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 849 (1982). Even the Court is without authority to circumvent the plain requirements of the rule by stating that objections made prior to the giving of the charge will be saved. *Spirito*, at 969. So strictly is the rule applied that a party who fails to make objection as required by the rule "cannot rely on an assurance by the district court that his rights are saved." *Carrillo*, 514 F.2d at 1219.

■ Further, the Court has considered the merit of the objection and, even passing the failure of the Defendant to preserve the claimed objection for assertion as error, the requested instruction is clearly not proper in the context of the evidence. It simply is not correct that on all of the evidence adduced in the course of this trial the jury could convict only if it were to resolve one way or another, beyond a reasonable doubt, the question of whether three or four persons participated in the robbery. The jury was free to accept or reject any or all of the testimony of any witness in the case. At least two witnesses testified specifically that three robbers entered the bank and that one remained outside in the car. Other witnesses testified to what they observed. Admittedly, each of them may not have had an opportunity to observe all of the participants in the robbery. Others may have testified inaccurately as to what they did observe. The witness Joseph Aceto testified that Defendant was one of the participants in the robbery who was in the bank. In any event, the question is one of fact and the resolution of it is properly within the province of the jury as finders of the facts of the case. There is certainly ample evidence in the record from which a jury could properly conclude that the Defendant was guilty of this offense whether three persons or four participated in the commission of the offense.

---

1. Also requested was a general instruction on the Government's burden of disproving beyond a reasonable doubt the Defendant's theory. The Court did not give such an instruction and Defendant objected. The Court denied the objection, fully articulating the reason that the proffered instruction was not the law.

## II. Claim That the Verdict is Against the Evidence and the Weight of the Evidence

■ Defendant makes a lengthy analysis of the evidence, attempting to demonstrate that the evidence does not support a verdict of guilty by proof beyond a reasonable doubt. The central premise of this entire argument is that no reasonable jury could believe any portion of the testimony of the Government's principal witness, Joseph Aceto. This proposition is clearly theoretically and factually erroneous with respect to this case. First of all, the assessment of credibility of the witnesses is uniquely and specifically a function of the jury. Defense counsel himself characterizes this argument as focusing "primarily on the unprobability of Aceto's testimony standing by itself, as well as on the conflict between Aceto's fabrications and the testimony of witnesses at the scene of the robbery." Defendant's Reply Memorandum in Support of His Motion for Acquittal and New Trial at 7.

Clearly, the jury could conclude that all or a significant part of the testimony of Joseph Aceto was true. If the jury accepted the testimony of Mr. Aceto, as it clearly did in this case, there was significant evidence of the Defendant's participation in the bank robbery with which he stood charged. The record clearly contains sufficient evidence of Barrett's culpability to withstand a motion for judgment of acquittal in which the Court must view all of the evidence in the light most favorable to the Government, drawing any reasonable inferences in favor of the Government's case. *United States v. Peters*, 732 F.2d 1004 (1st Cir.1984).

## III. Claim of Improper Lack of Parallelism in "Mockery of Justice" Instruction

Defendant contends "in instructing the jury the Court used the phrase 'mockery of justice' in characterizing an unlawful refusal to convict, and the phrase 'great injustice' in characterizing an unlawful refusal to acquit. Defense counsel objected, and the Court's added instruction did not meet the objection." Motion for Acquittal or New Trial at 25–6.

Defendant's argument is without merit. In the final substantive paragraph of the charge the Court instructed the jury as follows:

> In conclusion, ladies and gentlemen, I know that I need not remind you again that in the consideration of this case you must disregard entirely any personal sympathy or personal prejudice you may feel toward or against the Defendant or toward or against the Government. Under your oaths as jurors, you should determine the guilt or innocence of the Defendant on each count of the indictment solely upon the evidence which has been presented to you in this courtroom and under the law which has just been given to you by me. If the Government has established the guilt of the Defendant under the law, and beyond a reasonable doubt, you should find the Defendant guilty and it would be a mockery of justice for you to acquit the Defendant in such circumstance. If, on the other hand, in your view, the Government has not proved the guilt of the Defendant beyond a reasonable doubt, you should find the Defendant "not guilty," and it would be a great injustice to convict the Defendant in that circumstance.

Immediately thereafter at the sidebar conference for the objections of counsel to the charge, defense counsel stated as one of three specific objections made at that time:

> The only other question that I would raise at this point is at the very end of your remarks you said that if the jury were convinced of the Defendant's guilt, it would be a mockery of justice not to convict.

> THE COURT: But I then said—the next sentence is that if they determine that he is not guilty, that it would be a great injustice to convict him in that circumstance.

> [DEFENSE COUNSEL] Yes, your Honor. It may be just a detail, but I think the phrases are not as strong. They are not equivalent. And I have the concern

that the jury may infer something from the difference in language "it would be an equal mockery of justice."

THE COURT: I will clarify that.

[DEFENSE COUNSEL] That's all.

Within moments of that exchange the Court turned from the sidebar and addressed the jury as follows:

THE COURT: (addressing jury) I want to make it perfectly clear that in one respect you have an equal obligation, and that is, if you are satisfied that the Government has not carried its burden of proof beyond a reasonable doubt, you must find this Defendant not guilty. It is equally true that if you are satisfied that the Government has carried the burden by proof beyond a reasonable doubt of this Defendant's guilt, then you must find the Defendant guilty. You are not at liberty to exercise discretion as to what you will do once you come firmly and unanimously to either of those two conclusions. Those conclusions, either of them, once reached by the members of this jury unanimously to their satisfaction that they have been proven beyond a reasonable doubt, each dictates its own result, and I want to make sure that I did not lead any of you to believe that it was less compelling for you in one case to render the appropriate verdict than it was in the other case.

Defense counsel registered no further objection to the point raised at sidebar nor to the adequacy of the Court's curative instruction.

■ It is clear that the Court's curative instruction did specifically address the particular point raised in the objection at sidebar by defense counsel. Defense counsel's silence on the point after the curative instruction was given can justly be taken as indicating that *at the time* even defense counsel felt that the matter had been fully and properly addressed. The Court is satisfied that any elocutional imbalance that may have existed, as feared by defense counsel, was certainly redressed by the Court's subsequent instruction on the point.

## IV.  *Claim of Erroneous Exclusion of Proof of Aceto's Pending Homicide Indictment*

At the time of the trial in this case, Joseph Aceto, the prosecution's primary witness, was under indictment for homicide. The prosecution informed defense counsel of this fact on March 21, 1984, five days prior to commencement of trial. In the course of trial, during cross-examination of Mr. Aceto, defense counsel attempted to elicit testimony to show the pending homicide indictment against him. On objection, the testimony was excluded. The Court indicated that proof of the pendency of the indictment would not be allowed unless and until a foundational showing was made that Aceto had some motive, because of the pending indictment, not to testify truthfully or that his testimony was likely to be biased. The Court also warned defense counsel that any mention of the indictment prior to establishing such a foundation for relevance would be grounds for a mistrial. On cross-examination Mr. Aceto testified that his agreement with the Government had terminated. He testified that the Government had fully performed its agreement with him. Defense counsel did not elicit any testimony indicating that the Government had agreed to intercede on Aceto's behalf in the upcoming homicide proceedings.

After Aceto had been finally excused and returned to his distant place of incarceration, defense counsel requested and was granted the opportunity to have him returned to attempt again to lay the necessary foundation for introduction of the pending charge into evidence. At the *voir dire* defense counsel established only that Aceto knew of the homicide indictment. When objections to the leading nature of subsequent questions were sustained, defense counsel did not reframe the questions, but instead, declined to proceed with the *voir dire.*

Defendant now asserts that he was prejudiced in three ways by the prosecution's and the Court's treatment of the pending

indictment. First, he alleges that the Government's failure to disclose the charge sooner than March 21 prevented him from effectively preparing and presenting his defense. This contention is discussed in Part V of this Memorandum of Decision. Second, he asserts that the Court's failure to admit evidence of the charge was improper. Finally, he contends that his right to cross-examine Aceto was effectively chilled by the Court's admonition concerning a mistrial if the evidence of the indictment were to come in without having been previously admitted.

The principal issue raised is whether the Court erred in not admitting evidence of the pending indictment. This Court specifically instructs all juries in criminal cases, and so instructed this one, that an indictment is not proof of anything. An indictment, in and of itself, therefore, has no probative force. Defendant asserted that the pending charge had probative value because hope or expectation of favorable intervention from the prosecution regarding that charge provided Aceto with a motive to lie about Defendant.

■ Under Fed.R.Evid. 608(b) "specific instances of the conduct of a witness" may be inquired into on cross-examination, if, in the discretion of the Court, they will be probative of the witness' "truthfulness or untruthfulness." However, the Court's discretion in permitting or limiting cross-examination of witnesses on the issue of credibility is broad. *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931).

The First Circuit has set forth the applicable standard for judging the exercise of this discretion. In *United States v. Tracey*, 675 F.2d 433 (1982), the court found no abuse of discretion where:

> [c]ounsel had been given ample opportunity to show the witness' bias and to argue supportably from the evidence that the bias sprang from a subjective belief of favorable treatment from prosecutors. In contrast to the *Davis v. Alaska* situation, counsel here was allowed not only "to ask Green *whether* he was

biased" but was also permitted "to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness of trial."

*Id.* at 439 (*quoting Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)).

■ As was previously noted, the Court provided two opportunities for defense counsel to examine Joseph Aceto to show, as a foundation, any potential bias on his part resulting from the pending indictment. At the second examination, when Aceto had been returned to Maine specifically for such an inquiry, defense counsel established that Aceto knew of the pending indictment. After a few adverse evidentiary rulings on the form of his questions, which the Court invited him to rephrase, defense counsel in apparent frustration, decided to forego the examination. Defendant, therefore, was not deprived of any opportunity to demonstrate Aceto's bias except through his own choice. Absent a foundational showing of relevance to Aceto's credibility, evidence of the pending homicide charge was properly excluded as wholly irrelevant and without any probative force on any issue in the case.

The third point that Defendant asserts is that he was "chilled" in his ability to pursue other areas of cross-examination with respect to Aceto's credibility. This argument is disingenuous. The Court, contrary to Defendant's assertion, in no way improperly limited Defendant's cross-examination of Aceto. Indeed, Defendant cross-examined Aceto for the better part of two days on March 30 and 31, 1984. Defendant's cross-examination of Aceto was as vigorous, if not more so, as his cross-examination of any other witness in this case.

■ Defendant states that the Court's ruling "totally disorganized the planned cross-examination of Aceto regarding his bias." Motion for Acquittal or New Trial at 13. Even if true, that is not a legitimate basis to admit otherwise inadmissible testimony. Nor is it a basis to now provide

Defendant with a new trial. Defendant was permitted to explore the effect upon Aceto of the homicide charge on *voir dire* examination. He made the decision, as a matter of strategy, to terminate his questioning when he was not rewarded with the responses that he hoped to elicit. However, as in *Stack v. Vestal*, 540 F.Supp. 775, 777 (D.Me.1982), the jury had ample evidence before it upon which to make a "discriminating appraisal of the possible biases and motivations of the witness." *United States v. Tracey*, 675 F.2d 433, 437 (1st Cir.1982).

### V. *Claim of Delay in Production by Prosecution of Brady Material*

Defendant complains of delayed production of three categories of alleged *Brady* information. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). First, Defendant asserts that he first learned on March 21 of a pending homicide charge against the Government's principal witness, Mr. Aceto. Secondly, he complains that the prosecutor did not produce until March 28, the second day of the evidentiary stage of the trial in this matter, the so-called "Topsfield transcripts" of the state and federal law enforcement authorities' interrogation and debriefing of Aceto over a two-day period following his arrest on July 5, 1976. Finally, Defendant complains of the Government's delay in disclosing only on March 27 a letter from "Dr. Doe" dated March 26 raising questions by way of an evidentiary lead as to Mr. Aceto's mental state.[2]

It should be noted that the Government contends with respect to each category of information that it disclosed the informa-

tion within a reasonable time after the Government became aware of its existence. With respect to the "Topsfield transcripts," the prosecutor stated in oral argument on these motions that he first learned of the Topsfield interrogation and of the existence of the transcripts of that interrogation during the course of jury selection from Mr. Scribner, co-counsel for the defense. He asserts he immediately caused the matter to be investigated, obtained a copy of the transcripts, and within twenty-four hours turned that copy over to the defense. With respect to the "Dr. Doe letter," the prosecution turned that over to the defense on March 27, the day following the date which the letter itself bears.

▮ It is unnecessary to resolve any factual issue that may exist as to the time when the prosecutor first learned of the various items of information for it is undisputed that the information was not suppressed, that is, not produced at all by the Government in the course of trial. Defendant's complaint is that its production was improperly delayed. On such a claim the issue generated is whether the Defendant was able to effectively use the material, once it was disclosed, in preparing and presenting his case. *United States v. Peters*, 732 F.2d 1004 (1st Cir.1984). There is no denial of due process if *Brady* material is disclosed in time for its effective use at trial. *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir.1983). Here, it is apparent that the timing of disclosure of each of the categories of information in question did not result in the denial to Defendant of a fair trial. In each case his counsel had time to prepare for utilization of the infor-

---

**2.** The letter, which accompanied Mr. Aceto when he arrived in Portland, read as follows:

March 26, 1984
TO WHOM IT MAY CONCERN:
RE:
Dear Sir:
Patient [Joseph Aceto] has been under my treatment at .... He is receiving Mellaril 300 milligrams twice a day in addition to a multivitamin which I prescribed.
In the past he has been extremely agitated, delusional, and psychotic when not on medi-

cations. I feel that this medication, which is in the group of major tranquilizers, serves as an antipsychotic and sedating medication and should help to increase the veracity of his testimony rather than interfere with his testimony.
Sincerely,
[Dr. Doe]
The letter was admitted into evidence as Defendant's Exhibit No. 71.

mation and did, in fact, use the information at trial with compelling effect.

In the case of the pending homicide charge, the Government revealed its existence on March 21, five days before commencement of jury selection in this case and seven days before the beginning of the taking of evidence. Aceto did not take the stand until late in the day on March 29, and the defense did not begin its cross-examination of him until the afternoon of March 30. Thus, the information was in the hands of the defense for a total of eight and a half days before it could have first used that information in the course of cross-examination of Aceto. The fact that the defense's attempt to obtain admission of the fact of the pending indictment was ultimately unsuccessful was not to any extent the product of any lack of reasonable opportunity to prepare for its use. The timing of disclosure of the existence of the pending indictment in no way hindered the effective use of the information at trial.

With respect to the "Topsfield transcripts," these were produced by the Government on March 28. Thereafter, defense counsel made very extensive and effective use of the transcripts in the extended cross-examination of Mr. Aceto and also in the examination of several other Government witnesses. At no time during trial did defense counsel give any indication that it was at a disadvantage with respect to the use of the content of the transcripts to impeach Mr. Aceto directly on cross-examination or to undermine the credibility of his versions of events. The transcripts were embraced with enthusiasm by defense counsel and were in fact used with telling effect in attacking the Government's case. It would not be factually incorrect to say that a major portion of the cross-examination of several of the most important Government witnesses was consumed by a detailed confrontation of those witnesses with the content of the "Topsfield transcripts" and an exploration of their significance with respect to the credibility of Mr. Aceto. There is no basis to believe that the effectiveness of the use of the transcripts would have been enhanced in any way if the transcripts had been produced earlier, even assuming that the Government could have done so.

Finally, as a result of the prosecution's disclosure of the letter of March 26, defense counsel requested that "Dr. Doe" be brought from out of state in order that he might be interviewed by the defense with respect to Aceto's mental condition and used as a witness, if the defense so desired. The Court granted the defense's request, issued a subpoena for the doctor, and ordered the prosecution to facilitate the production of the doctor as rapidly as possible. The doctor was promptly produced, interviewed by the defense, and ultimately put on the witness stand by the defense. In the course of his testimony, the letter of March 26 was admitted in evidence as Defendant's Exhibit No. 71 and extensive testimony was taken out with respect to the letter and the significance of its contents. That testimony laid the foundation for the taking of the testimony of the Defendant's expert psychiatric witness, Dr. Brenner, for whom a subpoena was authorized by the Court at defense counsel's request. He testified to the defense's version of the significance of Mr. Aceto's medical state to his credibility. Dr. Brenner said, in summary, that the testimony of "Dr. Doe" and the content of the March 26 letter indicated to him, as a matter of professional expertise, that Aceto was a victim of paranoid schizophrenia and that he was psychotic, delusional and probably paranoid and subject to hallucinations. He went on to testify that these conditions should be taken to have a severely adverse effect upon the reliability of Mr. Aceto's testimony and indicated that these conditions could well undermine his *ability* to tell the truth.

Clearly, whatever exculpatory lead was contained in the March 26 letter of "Dr. Doe" was fully exploited by defense counsel and did in fact result in the production in the record of this case of most damaging evidence attacking Mr. Aceto's credibility. The Defendant's every request to the Court with respect to exploitation of this data was responded to affirmatively and no

complaint was made at trial that the defense had been hindered in the effective use of the data. Clearly, there was no impediment which arose out of the timing of the disclosure of the letter to the Defendant's use of the evidentiary lead and the evidence it generated on behalf of the defense.

### VI. Claim of Erroneous Limitation of Duration of Defense Counsel's Summation

Defendant argues that the Court's limitation of his argument to 1⅓ hours was error. He states that he required 2½ hours because he needed to closely examine the details of the trial, as evidenced by the exhibits, in order to impeach the credibility of the Government's witnesses and in order to reexamine the details of the robbery. In addition, Defendant argues that the Court's exclusion of evidence of Government witness Aceto's pending murder charge made it doubly necessary that he be allowed the additional 75 minutes.

There is no dispute that closing argument "is a basic element of the adversary fact-finding process in a criminal trial." Herring v. New York, 422 U.S. 853, 858, 95 S.Ct. 2550, 2553, 45 L.Ed.2d 593 (1975). However, as the Supreme Court stated in Herring:

This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects, he must have broad discretion.

Id. at 862, 95 S.Ct. at 2555. (Emphasis added.) See also Local Rule 25(a) (length of closing argument shall be fixed by the Court); United States v. Patterson, 678 F.2d 774, 781 (9th Cir.1982) (standard of review of district court is "abuse of discretion"); United States v. Stevenson, 554 F.2d 123 (4th Cir.1977); United States v. Hill, 500 F.2d 733, 739 (5th Cir.1974); United States v. Dye, 508 F.2d 1226 (1974).

The Court first inquired as to the length of the summations of both counsel at the conclusion of a discussion of the instructions to the jury. That occurred in the course of a conference in chambers, which in accord with Circuit practice was not on the record. Defense counsel at that time stated that he would require 2½ hours for summation. The prosecutor requested 30 to 40 minutes. The Court then told defense counsel that the Court would allow him 1 hour for summation. Defense counsel pleaded for some additional time. The Court ultimately said that the defense would be allowed 1¼ hours for summation. The conference ended. Defense counsel at no time asked for an opportunity to address the issue on the record and the Court believed that all counsel had accepted the Court's resolution of the matter as satisfactory. Defense counsel now asserts that he then believed that it would be impossible to sum up the defense's case in the time allotted to him. Defendant's Renewed Motion for Judgment of Acquittal at 1. However, counsel gave no such indication to the Court at that time. Defense counsel was not, throughout the trial, ever bashful about going to the record on even the most minor points. The Court is convinced that had defense counsel believed at that time that he had been prejudiced by the Court's allocation of time for summation, he would have asked to preserve the point on the record. He did not do so.

Subsequently, during counsel's closing argument the following colloquy occurred:

THE COURT: Mr. Flym, you have three minutes to conclude.

MR. FLYM: If your Honor please, I need to finish Mr. Aceto and then briefly touch on—

THE COURT: You have three minutes to conclude.

MR. FLYM: I will do my best, your Honor.

THE COURT: You will conclude in three minutes, Mr. Flym.

MR. FLYM: I can't do it, Judge.

THE COURT: Come to side bar.

(PROCEEDINGS AT SIDE BAR)

THE COURT: Make your record.

MR. FLYM: Judge, I would beg you to give me another 15 minutes. I just need to touch on two major elements of Mr. Aceto's credibility. He is the main witness. And I need to impeach his credibility. There's a couple of things I need to say about Mr. Barrett, but mainly I need to talk about Mr. Aceto, and I need to get to that, and I desperately need it.

THE COURT: It is now nearly 3:30.

MR. FLYM: I can't—all I need—I am simply requesting, your Honor, that I get 15 minutes. That's it period.

THE COURT: I talked with you before we began this oral argument in chambers and you asked me for two hours and a half, and I told you then I would give you an hour. You pleaded with me at that time and I said I would give you an hour and fifteen minutes and that's what I have given you.

MR. FLYM: Your Honor—

THE COURT: I will give you another five minutes if you will conclude in five minutes.

MR. FLYM: Thank you.

(SIDE BAR CONFERENCE CONCLUDED.)

Thereafter, at the close of the prosecution's rebuttal argument, counsel for Defendant asked the Court, at sidebar, to allow him to rebut the issue of Defendant's prior conviction for murder which he asserts was broached by the prosecution's rebuttal. That request was made in the following colloquy at sidebar:

(The following extract is taken from proceedings occurring immediately at the conclusion of the rebuttal argument of Mr. Terison:)

MR. FLYM: May I approach the bench?

THE COURT: Yes, you may.

(PROCEEDINGS AT SIDEBAR.)

MR. FLYM: At this point, your Honor, I just want to make it clear what I planned to touch upon in rebuttal and I never was allowed to do that. I didn't get into that part. I had planned to reach the whole question about the Poulos shooting at the tail end and I request at this point at least an opportunity to address that if nothing else and the question of the interest of Mr. Aceto. Those are the two key issues that I left to the end.

THE COURT: Mr. Terison, do you want to say anything?

MR. TERISON: Yes, your Honor. For the record, the defendant had close to an hour and a half, if not a full hour and a half, on argument and if that was so important, I'm sure he would have been able to find time in an hour and a half to get to it, and it comes down, your Honor, to the belief between the two witnesses. Mr. Flym spent a good part of his time in the closing argument addressing the issues of Mr. Aceto's credibility and he had an ample opportunity to do that.

THE COURT: While we are at sidebar, I would ask you: Have you seen the jury verdict?

MR. FLYM: No. (Verdict form shown to Mr. Flym.) That's all right.

THE COURT: Is that fine?

MR. FLYM: Yes.

THE COURT: Is that satisfactory?

MR. TERISON: Yes, your Honor.

THE COURT: Anything else, gentlemen?

MR. FLYM: Is there a ruling on my motion?

THE COURT: I didn't understand you were making a motion. I understood you were making a record.

MR. FLYM: No, no, it's a motion. I would like an opportunity to—

THE COURT: *To do what?*

MR. FLYM: *To do further argument briefly.*

THE COURT: *How much?*

MR. FLYM: *I want to address the two points that he raised.*

THE COURT: The motion is denied.

MR. FLYM: Thank you.

(Emphasis added.)

The request was denied because defense counsel would not answer the Court's inquiry as to *how much additional time he requested.* He appeared to be insisting on pursuing, out of normal order, two areas of argument for such time as *he* thought to be adequate for his purposes. Obviously, the Court was not required to grant such a *carte blanche* request. The refusal of defense counsel to specify the additional time he requested was, by itself, sufficient basis for discretionary denial by the Court of the request.

■ Defendant's basic argument is that 1¼ hours was an unreasonable time within which to argue his case, *see Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, because it was necessary for him to undertake a detailed examination of the testimony, "much of it contained in the numerous documents introduced as exhibits." Defendant's Renewed Motion, *supra*. The Court, however, viewed counsel's first 72 minutes of argument as very effective in pointing out the weaknesses of the prosecution's case and the strength of Defendant's case. Although the case was lengthy, it was not complex, the issues resting primarily on the credibility of Aceto and the Defendant. The Court gave counsel adequate time within which to argue the facts of the case.

Accordingly, Defendant's motion for a new trial based upon his contention that this Court abused its discretion by limiting summation to 1⅓ hours will be denied.

VII. *Claim that Court's Ruling Improperly Influenced Defense's Decision Not To Call Richard Picariello as Defense Witness*

Defendant further argues that a consequence flowing from the Court's ruling that evidence of the pending homicide indictment against Aceto was not admissible on the record as it then existed was that

Defendant decided not to introduce the testimony of Richard Picariello. That this was a tactical decision of the kind that every lawyer must make during the course of trial is demonstrated by the record. On April 3, 1984, the following colloquy took place in chambers:

THE COURT: Would you be in a position to put Picariello on before Aceto gets here so he could elicit whatever rebuttal testimony from Aceto?

MR. FLYM: No, I don't want to put Mr. Picariello on at all, as I have indicated, because although his testimony—as Mr. Terison has seen the affidavit and it is totally at odds with what Mr. Aceto claims. I don't want any hint of association between Mr. Barrett and Mr. Picariello. The two have never met in their lives before. I don't want the jury to wonder why it is that this bomber is coming to the defense of Mr. Barrett, and I don't want to run the risk that they will take whatever Mr. Picariello says and basically think of it as a fabrication which may have been, in their own minds subjectively, they may think that somehow Mr. Barrett is involved in urging it, even if it comes directly.

Defendant's argument is that this tactical decision was thrust upon him by the Court's prior ruling with respect to the homicide charge and that it would not have so developed had he been allowed to cross-examine Aceto about the charge. There is, however, in the Court's view, little logic to support this contention. The Defendant overlooks the fact that cross-examination about the homicide charge would not have alleviated the problems that Defendant's counsel articulated on the record, i.e., the possibility that the jury would link Defendant with Picariello and the obvious bias that Picariello had against Aceto to the disadvantage of the Defendant. These problems could not have been at all alleviated by a different ruling on the admissibility of the homicide charge against Aceto. In addition to the problems that Defendant articulates, the Court notes that Defendant

also ran the risk, if he introduced Picariello's testimony, that the jury would use Picariello's acquaintance with Aceto, along with the fact of his testifying on behalf of Barrett, to link Barrett with Aceto.

■ Defendant's decision was, therefore, a tactical one, not forced upon him because of any ruling of the Court, but because of the nature of Picariello's and Aceto's testimony and the danger posed to the Defendant by any undue association of the two with the Defendant. It is significant that defense counsel had made the decision not to call Picariello specifically for these reasons and had articulated that decision to the Court on April 3. At that time the Court had made no final decision on the matter of whether the evidence of the pending homicide charge against Aceto would be admitted. As the colloquy with counsel shows, the Court and counsel were then awaiting the return of Aceto from his distant location so that defense counsel could further explore the issue of the admissibility of the homicide charge.

## VIII. *Claim of Erroneous Admission of Poulos Death Certificate*

■ Defendant also argues that the Court erred when it admitted the Poulos death certificate into evidence. In his Motion for Acquittal or New Trial Defendant states: "On direct examination, the defendant testified that ... he had previously been incarcerated for twelve years for a shooting in which he believed he acted in self defense." *Supra*, at 17. Defendant argues that the subject of the shooting of Poulos is a collateral matter; consequently, under Fed.R.Evid. 608(b) the prosecution may not use extrinsic evidence to impeach a witness' answers with respect to such collateral matters.

Defendant has missed the crucial aspect of the subject of the Poulos shooting. As Defendant admits on page 17 of his brief, it was Defendant who first broached the subject of the Poulos shooting. Defendant did so in order to explain why he fled upon learning that he had been indicted for bank robbery. Thus, Defendant made the issue

of whether or not he shot Poulos in self-defense a *material* issue in this case. The issue is material because Defendant argued that he had a legitimate reason for having fled (i.e., his prior wrongful conviction for killing Poulos) and that his flight should not be accorded weight as probative of guilt. If Defendant is permitted to argue such inferences to the jury, then the prosecution should be allowed to impeach Defendant on such a material issue and to argue logical inferences therefrom. The admission of the death certificate, which showed that Poulos had been shot in the back, not in the side as the Defendant testified, was not erroneous.

## IX. *Exclusion of Transcript of Prior Trial*

■ After the Court admitted Poulos' death certificate, defense counsel attempted to offer a portion of the transcript of Defendant's 1963 trial in surrebuttal. Relying on Fed.R.Evid. 804(b)(1), the Court refused to allow admission of the evidence. Defendant now argues that the transcript should have been admitted under either Rule 804(b)(5) or Rule 803(24). The Court disagrees.

At the outset the Court points out that Defendant did not actually produce the transcript. Rather, he read to the Court from a brief submitted in Barrett's Massachusetts appeal which cited the transcript. It was not evident to the Court that counsel could indeed produce the transcript if necessary. Even if the transcript had been available, its use was clearly precluded by Rule 804(b)(1) which provides:

The following are not excluded by the hearsay rule *if the declarant is unavailable as a witness:*

(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, ... *if the party against whom the testimony is now offered,* or in a civil action or proceeding, a predecessor in interest, *had an opportunity and similar motive to develop the testimo-*

*ny by direct, cross or redirect examination.*

(Emphasis added.)

The first failing of the proffer was that there was no showing by defense counsel that the declarants, the coroner and ballistics expert, were unavailable as that term is defined in Fed.R.Evid. 804(a). Moreover, the prosecution in this case, the United States, had no previous opportunity to develop the testimony by examination of any sort at the Massachusetts trial.

In his memoranda Defendant puts forth Rules 804(b)(5) and 803(24) as grounds for admitting the transcripts. Rule 804(b)(5) states explicitly that it applies only to "statement[s] not specifically covered by any of the foregoing exceptions." Since former testimony is "specifically covered" by Rule 804(b)(1), subsection (b)(5) cannot be employed as a means of circumventing its requirements. Similarly, Rule 803(24) cannot provide the basis for admitting testimony specifically addressed in another exception. Both Rules 803(24) and 804(b)(5) provide very narrow, *residual* exceptions to be used rarely and only in exceptional circumstances. Fed.R.Evid. 803, Notes of Committee on the Judiciary, Senate Report No. 93–1277, U.S.Code Cong. & Admin. News 1974, p. 7051. There is, therefore, no exception to the hearsay rule which would have permitted the admission of transcripts of Defendant's former trial into evidence.

### X. *Prosecutorial Misconduct*

■ Defendant also asserts that he was prejudiced by the delay of Aceto's scheduled murder trial occasioned by the allegedly bad faith representation of the United States Attorney that Aceto would be needed to testify at trial sooner than he actually was. Defendant contends that the prosecution maneuvered the delay of Aceto's trial to its own advantage. It was clear, however, at the final pretrial conference held late on March 21 that if defense counsel desired a continuance, Defendant's trial would have been postponed until mid to late May, long after the April 6 date set for Aceto's postponed trial. The Defendant's complaint is in reality about the fortuity of

events external to the trial; not, as he asserts, with any interference with the inherent integrity and fairness of the trial process itself. The right to a fair trial does not encompass any right of the defendant to set the schedule or the circumstances under which he will be tried. *See United States v. Bentvena,* 319 F.2d 916 (2d Cir. 1963); *see also United States v. Tortora,* 464 F.2d 1202 (2d Cir.1972). Therefore, there was no prejudice to the Defendant because impeachment evidence was not in the state in which he desired it at the time of trial.

### XI. *Late Disclosure of Dr. Jacobsohn's Examination of Aceto*

■ As another basis for his claim of error, Defendant contends that the prosecution should have disclosed, before its rebuttal case, that Aceto had been examined by Dr. Jacobsohn. The Government did not disclose that Dr. Jacobsohn had performed such an examination until the Government's rebuttal case, even though it had known of such examination during its case-in-chief, the examination having been performed on March 29, 1984. Defendant argues that disclosure was warranted: (1) pursuant to his motion under Fed.R. Crim.P. 16; (2) pursuant to his motion asking for all impeaching evidence; and (3) pursuant to the prosecution's agreement to name its possible witnesses no later than March 26, 1984.

That the prosecution did not have to agree to divulge its possible witnesses is clear from the federal rules. *See* Fed.R. Crim.P. 16(a)(2). Even when the Government agrees voluntarily to disclose its witnesses "the disclosure need only extend to witnesses intended to be called in the case-in-chief." *United States v. Angelini,* 607 F.2d 1305, 1308–9 (9th Cir.1979). *See also United States v. Windham,* 489 F.2d 1389, 1392 (5th Cir.1974) (rebuttal witnesses are a recognized exception to all witness disclosure requirements). The prosecution's need for Dr. Jacobsohn clearly arose only when the Defendant questioned Aceto's competency to testify in a credible fashion.

Therefore, the import of Dr. Jacobsohn's testimony was for rebuttal.

■ Defendant's argument that Dr. Jacobsohn's testimony was important for impeachment does not comport with the testimony actually admitted into evidence. Dr. Jacobsohn testified that his examination of Aceto had not turned up anything to suggest that Aceto could not act as a credible witness. Far from being impeaching evidence, this testimony served only to militate against Defendant's arguments with respect to the credibility of Aceto.

Defendant further argues that the examination of Aceto was material to Defendant's preparation of his case in that the fact that Dr. Jacobsohn had examined Aceto in order to form his opinions was a "complete and devastating surprise" to Defendant in light of the fact that Defendant's expert, Dr. Brenner, had not examined Aceto in preparation for Dr. Brenner's testimony. As the Court understands Defendant's argument, it is not the substance of what Dr. Jacobsohn testified about, but the method he used in order to acquire the substance that is the harm that accrued to Defendant. That being so, the Court is unable to determine how the mere fact that Dr. Jacobsohn examined Aceto is at all material to Defendant's case under Fed.R. Crim.P. 16(a)(1)(D). Defendant claims that had he known that Dr. Jacobsohn had examined Aceto, he would have had Dr. Brenner also examine Aceto as basis for his testimony. However, Defendant overlooks the fact that he could have had Dr. Brenner examine Aceto in the first place, independent of any consideration of Dr. Jacobsohn's testimony. Defendant *never* asked the Court to allow its expert, Dr. Brenner, to examine Aceto despite this Court's solicitude of the Defendant's every request for aid. Thus, Defendant's argument that he was devastatingly surprised is disingenuous. Furthermore, if Dr. Jacobsohn's testimony became material at some point, that point was not until April 4, 1984, when Defendant realized that he would require the services of Dr. Brenner. As the Court has already noted, Defendant claims that he was harmed by the *fact* of the examination and not by the substance of what emerged. While the prosecution arguably had a duty as of April 4, 1984, to disclose the fact of Dr. Jacobsohn's examination of Aceto, the Court cannot agree with Defendant that he was prejudiced. Again, as the Court has previously noted, Defendant could have asked to have Dr. Brenner examine Aceto. In light of Defendant's pattern of vigorously contesting events he found objectionable during the trial, and in light of Defendant's repeated requests for aid from the Court in such matters as issuing subpoenas to witnesses to testify and encouraging the prosecution to volunteer information, the Court can only conclude that Defendant made a tactical decision not to request permission for Dr. Brenner to examine Aceto. The prosecution in this case did not deliberately withhold Dr. Jacobsohn's name throughout the trial. *See Weatherford v. Bursey*, 429 U.S. 545, 560, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977). If any prejudice accrued to Defendant, it accrued principally as a result of the Defendant's strategic decisions. Accordingly, Defendant's motion is denied to the extent that it is based on the above ground.

## XII. Claim of Prosecutorial Misconduct Due to Improper Judicial Contact During Trial

■ On the morning of March 29, 1984, the United States Marshal informed the Court that Jack McCambridge, a member of the defense team seated at counsel table, had an extensive criminal record of violent crimes, including armed bank robbery.[3] *See United States v. McCam-*

---

**3.** The Marshal called to the Court's attention a transcript from the United States Department of Justice, Federal Bureau of Investigation, purporting to reflect Mr. McCambridge's criminal record. That transcript showed the following entries:

| PD Palm Beach Fla | John Michael McCambridge, #A 1943 | 2–20–53 *– —— | reck dr caus accident | 2–20–53 rel no chgs presse |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| PD Vero Beach Fla | M. John McCambridge # | 2–26–53 | B&E | trial pend |
| SO Vero Beach Fla | John M. McCambridge #5382 | 2–26–53 | att B & E | pending 3–24–54 $75 or 60 dys susp |
| SPol Troy NY | John Michael McCambridge #10256 | 8–23–53 | fugitive from justice | |
| H of C Billerica Mass | John Michael McCambridge #22852 | 9–23–53 | B & E night time & larc att to steal MV | 9 mos 9 mos conc (2 cts) |
| PD Boston Mass | John Michael McCambridge #92791 | 10–25–54 | S P armed rob | |
| *——— West Concord Mass | John Michael McCambridge #36261 | 12–14–54 | carrying rev on his person | indeterminate limited to 5 yrs |
| Mass Corr Inst Bridgewater Mass | John Michael McCambridge #SH–6853 | 2–21–59 | patient | (35 das observation) |
| PD Boston Mass | John Michael McCambridge #109313 | 12–15–59 | SP att armed rob | |
| Mass Corr Inst South Walpole Mass | John M McCambridge #W27776 | 1–11–60 | being armed w/ dang weap did aslt w/i rob | 6–8 yrs |
| ·PD Boston Mass | John Michael McCambridge #126262 | 10–11–64 | SP mur | |
| PD NY NY | John McCambridge #B 594693 | 11–23–64 | forg (American Express Travelers Checks) | |
| Chief Prob Off Supreme Crt NY NY | John McCambridge 94868MO | 11–23–64 | P guilty GL 2nd degree | |
| Sing Sing Pr Ossining NY | John D McCambridge #135838 | 6–4–65 | NY Co Supreme Ct NY conf GL 2nd | 2–6/5–0 10–10–66 per |
| PD Boston Mass | John M. McCambridge | 5–4–66 | def manslaughter | |
| Mass Corr Inst South Walpole Mass | John M. McCambridge #30984 | 10–10–66 | manslaughter unlaw car firearm on his person | 9–12 yrs f&a NY snet 3–5 cc |
| SO Everett WA | John Michael McCambridge B 30073 | 4–5–75 | 1 Felon in poss firearm 2.carrying loaded gun in veh 3.poss veh w/ altered vin | 1–Nothing filed Dism on chg 2, 3—Felon Fug Follow to Close Fail to stop for emerg veh & Dri—w/ exp lic |
| USM Boston MA | John M McCambridge 8347 | 6–6–75 | bank robbery | |

* Illegible.

*bridge,* 551 F.2d 865 (1st Cir.1977). Defendant complains that the Marshal's communication of this information was an "improper" contact, attributable to the prosecutor under 28 U.S.C. 569(c).[4] Before commencement of the trial, defense counsel sought the Court's permission for Mr. McCambridge to sit inside the rail at trial as a member of the defense team. Defense counsel represented Mr. McCambridge to be the defense investigator and made no disclosure of his prior criminal record. The Court granted permission for Mr. McCambridge to sit inside the rail. During the first few days of the trial Mr. McCambridge was seated at defense's counsel table.

The trial of this case was conducted under the heaviest security of any trial in the history of the District of Maine. It involved the trial of an alleged associate of two violent fugitives, Mr. Levasseur and Mr. Manning, who are on the FBI's "Ten Most Wanted List" for various courthouse bombings and other violent crimes. One of the principal witnesses was Mr. Aceto, according to his own admission a former associate of Levasseur and Manning. At the time of trial Aceto was a federally protected witness who, the Court was informed, lived in constant danger of harm from Levasseur, Manning and their associates. At all times during his appearance in Maine for the trial Aceto was accompanied by a protective force of six to eight United States Marshals, and the most stringent precautions were taken for his safekeeping. Throughout the trial the strictest security procedures were generally followed. This was well known to all counsel. Several former associates of Mr. Levasseur and Mr. Manning were identified by the Marshal's office as being spectators at various times during the trial.

In this security environment the Court, on being advised of Mr. McCambridge's history, called a conference of counsel in chambers, on the record, and expressed its surprise and distress that the Court had not previously been apprised of Mr. McCambridge's background. Ultimately, being unsatisfied with defense counsel's protestations that Mr. McCambridge posed no danger, the Court ordered him to sit behind the rail thereafter. Defense counsel vigorously protested this order on the record.

Defendant now argues that the Marshal's conduct was improper because by it, "the Court was exposed to highly prejudicial information 'concerning a pending prosecution,' within the meaning of Canon 3(A)(4) of the Code of Judicial Conduct for United States Judges." Addendum to Defendant's Motion for Acquittal or New Trial at 3. The alleged wrongdoing is attributed to the prosecutor.

Defendant's argument fails for two principal reasons. First, the assumption that the contact originated from or should be attributed to the prosecutor is wrong. Prior to the commencement of trial, the United States Marshal had advised the Court in detail on the elaborate security precautions proposed for the trial in order to secure the Court's approval of the in-court aspects of those precautions so that no improper activity should occur in the courtroom. The Court had instructed the Marshal that it was to be kept abreast of any security developments that might pose any hazard

| | | | | |
|---|---|---|---|---|
| US Pen Lewisburg PA | John Michael McCambridge 05390–158 | 2–14–77 | Bank Robbery | 15 yrs 12–10–82 MR |
| F | F052736 | | | |
| Norfolk Co H of C Dedham MA | John Michael McCambridge 49116 | 2–1–77 | escape | 3 mos conf Norfolk Co H of C |

---

**4.** Title 28 U.S.C. § 569(c) reads as follows:

The Attorney General shall supervise and direct United States Marshals in the performance of public duties and accounting for public moneys. Each marshal shall report his official proceedings, receipts and disbursements and the condition of his office as the Attorney General directs.

to the safety of those in the courtroom. It was pursuant to this directive, not to any action of the prosecutor, that the Marshal acted in calling Mr. McCambridge's prior criminal record to the attention of the Court. The Court clearly had the legitimate authority in the atmosphere of this trial to make suitable arrangements to maximize its ability to discharge its duty to safeguard the well-being of the jurors, the Defendant, court personnel, the attorneys, and spectators at the trial. The arrangements with the Marshal described above were clearly appropriate to that purpose and do not reflect any bias of the Court against this Defendant.

Second, Defendant himself points to no specific instance in which the Court's knowledge of Mr. McCambridge's background caused the Court to decide any issue against his interest as the result of bias. The challenge is left hanging nonspecifically, even by the Defendant, with the abstract assertion that the incident involves

> "the risk of improper influence, conscious or unconscious, upon judges who exercise discretion in ruling on issues both of law as well as of mixed fact and law. Constitutional fairness requires insulating a defendant from the well-known risks of guilt by association and the burden is on the prosecution to justify transgression of that rule."

Addendum, *supra*, at 4. However, even though knowing of the incident in the course of trial, the Defendant did not at any time challenge any subsequent decision or ruling of the Court as being the product of improper bias or prejudice of the Court against the Defendant for any reason whatever, much less specifically because of this incident. Even in the post-trial briefing of this contention, defense counsel does not point to any specific decision which is claimed to have been improperly rendered or to have been affected by bias of the Court generated by its knowledge of Mr. McCambridge's prior criminal record. The Defendant, in fact, concedes that the incident is one "which, perhaps, ought to be left forgotten." *Id.* at 3. In the absence of any suggestion of a specific instance of

prejudice that assessment is probably correct. In any event, the Court is fully satisfied that no such improper influence on its decision-making process ever occurred at any time.

### XIII. ORDER

Defendant's Renewed Motion for Judgment of Acquittal, filed on April 7, 1984, and Defendant's Motion for Acquittal or New Trial, filed on April 18, 1984, are each hereby DENIED.

So ORDERED.